UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x

TERRENCE BROWN,

               Plaintiff,

  -against-

VERIZON NEW YORK, INC.

               Defendant.
------------------------------------------------------------x

**COMPLAINT**
**JURY DEMAND**

CV 12 - 3705

BRODIE, J.

AZRACK, M.J.

FILED CLERK
SUMMONS ISSUED
U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK

## I. NATURE OF THE ACTION

1. This action is brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et. seq.* ("Title VII") and Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. 1981 (§ 1981). Plaintiff, an African American, charges that defendant has subjected him to a hostile work environment on account of his race and retaliated against him for opposing discrimination and engaging in protected activity. Plaintiff charges, in addition, that defendant Verizon New York, Inc. has been engaged in ongoing and continuing discriminatory policy and practice in that it has permitted a managerial employee to intimidate, abuse, and retaliate against plaintiff and other African American employees over an extended period of time without taking any remedial or corrective action. Plaintiff asserts pendent State claims for race discrimination and retaliation under New York State Executive Law § 296 *et. seq.* ("Human Rights Law") and race discrimination and retaliation under New York City Administrative Code § 8-107 *et seq.*

## II. JURISDICTION

2. Jurisdiction is conferred upon this court by 29 U.S.C. §1343(a), 28 U.S.C.§§ 2201 and 2202. Plaintiff invokes the pendent jurisdiction of the court to adjudicate claims arising under State Law and local law.

## III. THE PARTIES

3. Plaintiff Terrence Brown ("Mr. Brown") is an African-American and a citizen of the United States.

4. Defendant Verizon New York, Inc. ("Verizon") is a corporation doing business in the State of New York.

## IV. STATEMENT OF CLAIMS

5. Mr. Brown commenced employment with Verizon New York, Inc. ("Verizon") in the position of Field Technician on or about April 3, 2000.

6. Mr. Brown's primary duty and responsibility as a Field Technician was providing telecommunication services to Verizon customers.

7. At all times mentioned herein Mr. Brown performed his duties and responsibilities in a satisfactory manner.

8. While employed at Verizon over an extended period Mr. Brown was subjected to a hostile and abusive work environment on account of his race was retaliated against for opposing discrimination and engaging in protected activity.

2

9. While employed by Verizon, Mr. Brown was primarily assigned to Verizon's work facility located at 175 Third Street, Brooklyn, New York.

10. In or about the summer of 2007, Mr. Brown came under the supervision of Supervising Manager William Ost, who is Caucasian.

11. Mr. Ost has a reputation in the Verizon workplace for bullying, intimidating and insulting African Americans and other ethnic minorities who work under his supervision.

12. Mr. Ost stated to an African American Field Technician, Lamont Hymes, "You need to work more overtime so you can buy chicken for your people."

13. On another occasion Mr. Ost told Communication Workers of America Local 1109 African American Shop Steward Marion Mike and African American Field Technician Kieth Smith that "black people steal."

14. Upon information and belief, Verizon transferred Mr. Ost to its Third Street work facility because of his history of abusive treatment of African American employees and other ethnic minorities at his former workplace.

15. While working under Mr. Ost's supervision, Mr. Brown was subjected to a persistent pattern of bullying, intimidation, and harassment on account of his race and color.

16. In July 2007, alluding to Brown's race, Mr. Ost stated, " I don't want you outside getting any darker."

17. The following day Mr. Brown told Mr. Ost that he found the remark he made offensive. Mr. Ost responded, " If you don't like what I said, you can call the Dark Avenger."

3

alluding to the Communication Workers of America Local 1109 African American Shop Steward Marion Mike.

18. In October 2007, Mr. Ost, after noticing Mr. Brown had grown a beard, stated, "Have you joined Al Qaeda? Because with that beard you look like a terrorist."

19. Mr. Brown reported Mr. Ost's conduct to Dennis Hogan of Verizon's Ethics Department.

20. After Mr. Brown reported his conduct to Verizon's Ethics Department Mr. Ost embarked on course of harassment and intimidation of Mr. Brown.

21. On February 12, 2008, in an effort to provoke a physical altercation with Mr. Brown Mr. Ost approached him, put his arm around his shoulder and whispered, "I m your gay uncle." When Mr. Brown removed his hand from his shoulder, Mr. Ost became enraged, moved close to Brown in a threatening manner, threw Mr. Brown's assignment on his desk, and told him that he was placing him " under investigation."

22. On or about February 12, 2008, Mr. Brown reported Mr. Ost's abusive conduct to Dennis Hogan. Verizon management took no corrective action against Mr. Ost.

23. On or about November 10, 2008, Mr. Ost approached Mr. Brown in the Verizon parking lot, stood a few inches from him, stared at him in a threatening manner, then shouted, "Get inside and get your work!"

24. Mr. Brown reported Mr. Ost's behavior in the parking lot to Verizon's Ethics Department. Verizon management took no corrective action against Mr. Ost. Dennis Hogan told Mr. Brown to "do what you are suppose to do and don't mouth off."

25. On December 29, 2008, in another effort to provoke a physical altercation with Mr. Brown, Mr. Ost approached him, put his hand on his shoulder, grinned, and then threw Mr. Brown's work assignment on his desk.

26. Mr. Brown reported Mr. Ost's December 29, 2008 conduct to Verizon's Ethics Department. Verizon took no corrective action against Mr. Ost.

27. After Mr. Brown began reporting Mr. Ost's conduct to Verizon's Ethics Department, in addition to subjecting him to intimidation, Mr.Ost began retaliating against him by changing the terms of his employment.

29. Mr. Ost placed Mr. Brown under strict surveillance while he was at the Verizon facility and changed the manner in which he was assigned work in the field.

30. Mr. Ost began personally inspecting Mr. Brown's Verizon vehicle almost on a daily basis, in an effort to find a violation.

31. Mr. Ost sent other Field Technicians to the job locations Mr. Brown was assigned in order to spy on him.

32. On August 23, 2009 Mr. Ost personally went to Mr. Brown's job assignment at 304 Court Street in Brooklyn to spy on him.

33. At Verizon, Field Technicians are normally given four job assignments in the field when they report to work.

34. After Mr. Brown began complaining to Verizon's Ethics Department about Mr. Ost's conduct, upon information and belief, Mr. Ost directed that Mr. Brown be given only one job assignment when he reported to work. As a consequence of the change in the manner in

5

which he received his assignments Mr. Brown had to call the dispatcher from his location in the field in order to obtain his next job assignment.

35. The fact that Mr. Brown had to personally contact the dispatcher after the completion of each assignment caused him to suffer unnecessary delays in reaching the location of his next job assignment.

36. As a consequence of the change in the manner in which he was given his assignments in the field Mr. Brown experienced a reduction in his overall daily average for jobs completed.

37. In or about the summer of 2008, Mr. Ost further retaliated against Mr. Brown by causing him to be transferred to Verizon's Nevins Street work site where he was assigned hard physical labor, including breaking cement, removing telephone poles and cables, and loading trucks.

38. On April 13, 2009, Mr. Brown returned from vacation and discovered that his Verizon vehicle was missing from the garage at the Verizon work facility. When Mr. Brown inquired about his vehicle, Cruz Montezuma, a Verizon Manager, informed Mr. Brown that Mr. Ost had told him that he [Mr. Brown] was responsible for the vehicle being missing from the garage. Later, Mr. Brown with the assistance of other Verizon employees, located the vehicle in an auto body shop, vandalized, with the seats removed. An employee of the body shop informed Mr. Brown that it was Mr. Ost who had had the truck delivered to the body shop.

39. Mr. Brown became suspicious and concerned about the circumstances surrounding how his Verizon vehicle ended up in the body shop vandalized. He thereupon obtained

permission from Verizon Manager Frank Volpe to begin using a vehicle assigned to another Field Technician.

40. On April 22, 2009, Mr. Brown's Verizon vandalized vehicle was repaired and returned to the Verizon facility. Later that day Mr. Brown noticed that Mr. Ost had followed him to the Verizon garage and was watching him surreptitiously, waiting for him to enter the Verizon truck.

41. In April 2009, depressed, frightened and anxious about the persistent harassment and abusive work environment, Mr. Brown obtained short term disability for seven weeks.

42. On May 14, 2009, Mr. Brown filed a charge of race discrimination and retaliation with the Equal Employment Opportunity Commission. ("E.E.O.C.")

43. On October 15, 2009, when he reported to work Mr. Brown was told to remain at the Verizon facility because of what he was told was an "investigation." At about 11 a.m. Mr. Brown was told he could commence his route. When Mr. Brown went to his Verizon vehicle and opened the back door to the tools compartment he discovered a yellow rope tied into a hangman's noose, with approximately ten feet of rope attached to it. Shocked and outraged Mr. Brown reported incident to representatives of Communication Workers Association Local 1109 and then had his attorney write to Verizon management about the incident.

44. On October 23, 2009, in an act of retaliation, Verizon terminated Mr. Brown's employment under the pretext that he violated Verizon's Code of Conduct.

45. On May 2, 2012, the E.E.O. C issued a determination finding probable cause to believe that Verizon has violated Title VII and issued Mr. Brown a Notice-of- Right-to-Sue.

46. This action was commenced within ninety days from the issuance of the Notice-of-Right to-Sue.

47. Prior to commencing this action plaintiff caused a copy of this complaint to be filed with the New York City Commission on Human Rights.

## V.   PLAINTIFF'S FIRST CLAIM FOR RELIEF

48. Plaintiff repeats the matters set forth in paragraphs 1 through 47.

49. Defendant's conduct as described above constitutes discrimination on account of race in violation of Title VII.

50. As a consequence of defendant's discriminatory conduct in violation of Title VII, plaintiff suffered lost wages in an amount to be determined at trial, as well as extreme emotional distress, resulting in damages in the amount of $ 300,000.00.

51. Insofar as defendant discriminatory conduct as described above was wanton and in reckless disregard for plaintiff's civil rights, plaintiff is further entitled to punitive damages in the amount of $ 300,000.00.

## VI.  PLAINTIFF'S SECOND CLAIM FOR RELIEF

52. Plaintiff repeats the matters set forth in paragraphs 1 through 47.

53. Defendant's conduct as described above constitutes retaliation in violation of Title VII.

54. As consequence of the defendant's retaliatory conduct, plaintiff has suffered, lost wages in an amount to be determined at trial, as well as extreme emotional distress, resulting in damages in the amount of $ 300,000.00.

55. Insofar as defendant's retaliatory conduct as described above was wanton and in reckless disregard for plaintiff's civil rights, plaintiff is further entitled to punitive damages in the amount of $ 300,000.00.

## VII.  PLAINTIFF'S THIRD CLAIM FOR RELIEF

56. Plaintiff repeats the matters set forth in paragraphs 1 through 47.

57. Defendant's conduct as described above was intentional and constitutes discrimination on account of race and color in violation of §1981.

58. As a consequence of defendant's violation of § 1981, plaintiff suffered, lost wages in amount to be determined at trial, as well as extreme emotional distress, resulting in damages in the amount of $5,000,000.00.

59. Insofar as defendant's discriminatory conduct as described above was wanton and in reckless disregard for plaintiff civil rights, he is further to entitled to punitive damages in the amount of $10,000,000.00.

## VIII.  PLAINTIFF'S FOURTH CLAIM FOR RELIEF

60. Plaintiff repeats the matters set forth in paragraphs 1 through 47.

61. Defendant's conduct as described above constitutes retaliation for opposing discrimination and engaging in protected activity, in violation of § 1981,

62. As consequence of defendant's of retaliatory conduct in violation of § 1981, plaintiff suffered lost earnings in an amount to be determined at trial, as well as extreme emotional distress, resulting in damages in the amount of $5,000,000.00.

63. Insofar as defendant's retaliatory conduct as described above was wanton and in reckless disregard for plaintiff's civil rights, he is further entitled to punitive damages in the amount of $10,000,000.00.

### IX. PLAINTIFF'S FIFTH CLAIM FOR RELIEF

64. Plaintiff repeats the matters set forth in paragraphs 1 through 47.

65. Defendant's conduct as described above constitutes discrimination on account of race in violation of the New York State Human Rights Law.

66. As a consequence of defendant's discriminatory conduct in violation of New York State Human Rights Law plaintiff suffered lost wages in an amount to be determined at trial, as well as extreme emotional distress, resulting in damages in the amount of $5,000,000,00.

### X. PLAINTIFF'S SIXTH CLAIM FOR RELIEF

67. Plaintiff repeats the matters set forth in paragraphs 1 through 47.

68. Defendant's conduct as described above constitutes retaliation in violation of New York State Human Rights Law.

69. As a consequence of defendant's retaliatory conduct plaintiff suffered lost earnings in an amount to be determined at trial, as well as extreme emotional distress, resulting in damages in the amount of $5,000,000.00.

### XI. PLAINTIFF'S SEVENTH CLAIM FOR RELIEF

70. Plaintiff's repeats the matters set forth in paragraphs 1 through 47.

71. Defendant's conduct as described above constitutes discrimination on account of race in violation of New York City Administrative Code § 8-107 *et. seq.*

72. As a consequence of defendant's discriminatory conduct in violation of New York City Administrative Code § 8-107 *et. seq.*, plaintiff suffered lost earnings in an amount to be determined at trial, as well as extreme emotional distress, resulting in damages in the amount of $5,000,000.00.

73. Insofar as defendant's discriminatory conduct as described above was wanton and in reckless disregard for plaintiff's civil rights, he is further entitled to punitive damages in the amount of $10,000,000.00.

## XII. PLAINTIFF'S EIGHTH CLAIM FOR RELIEF

74. Plaintiff's repeats the matters set forth in paragraphs 1 through 47

75. Defendant's conduct as described above constitutes retaliation in violation of New York City Administrative Code § 8-107 *et. seq.*

76. As a consequence of defendant's retaliatory conduct in violation of New York City Administrative Code §8-107, plaintiff suffered lost earnings in an amount to be determined at trial, as well as extreme emotional distress, resulting in damages in the amount of $5,000,000.00.

77. Insofar as defendant's conduct as described above was intentional and in reckless disregard for plaintiff's civil rights, he is further entitled to punitive damages in the amount of $10,000,000.00.

## XIII. JURY DEMAND

78. Plaintiff demands that all the issues in this action be tried by a jury.

WHEREFORE, plaintiff demands judgment in his favor against defendant with respect to his First Claim for Relief in the amount of $300,000.00, plus back pay in an amount to be determined at trial, reinstatement, together with reasonable attorney fees; judgment on plaintiff's Second Claim for Relief in the amount of $300,000, back pay in an amount to be determined at trial. reinstatement, together with reasonable attorney fees; judgment on plaintiff's Third Claim for Relief in the amount of $5,000,000.00, together with punitive damages in the amount of $10,000,000.00, with reasonable attorney fees; judgment on plaintiff's Fourth Claim for Relief in the amount of $5,000,000.00, together with $10,000,000.00 in punitive damages, with reasonable attorney fees; judgment on plaintiff's Fifth Claim for Relief in the amount of $5,000,000.00, with reasonable attorney fees; judgment on plaintiff's Sixth Claim for Relief in the amount of $5,000,000.00, reinstatement, with reasonable attorney fees; judgment on plaintiff's Seventh Claim for Relief in the amount of $5,000,000.00, together with punitive damages in the amount of $10, 000,000.00, reinstatement, reasonable attorney fees; and judgment on plaintiff's Eighth Claim for Relief in the amount of $5,000,000.00, together with $10,000,000.00 in punitive damages, reasonable attorney fees, and costs and disbursements.

Dated: Brooklyn, New York
July 16, 2012

ROOSEVELT SEYMOUR
*Attorney for Plaintiff*
162 Montague Street, Suite 201
Brooklyn, New York 11201
(718) 802-0055